Frank **SCHONFELD, Individually, and as Secretary-Treasurer of District Council No. 9, International Brotherhood of Painters & Allied Trades, AFL–CIO,** Plaintiff,

v.

S. Frank **RAFTERY, as President of the International Brotherhood of Painters & Allied Trades, AFL–CIO, et al.,** Defendants.

Robert **FRITSCH** and Peter **Rossiter,** Plaintiffs,

v.

**DISTRICT COUNCIL NO. 9, BROTHERHOOD OF PAINTERS, DECORATORS AND PAPERHANGERS OF AMERICA, et al.,** Defendants.

Nos. 70 Civ. 2544 and 67 Civ. 3147.

United States District Court, S. D. New York.

May 8, 1973.

See also, D.C., 335 F.Supp. 846.

Martin Raphael, New York City, for plaintiff Schonfeld.

Basil R. Pollitt, Brooklyn, N.Y., for plaintiffs Fritsch and Rossiter.

Vladeck, Elias, Vladeck & Lewis, New York City, for defendants Raftery and Di Silvestro by Stephen Vladeck, and Richard Kosinski, New York City, of counsel.

Henry J. Easton, New York City, for defendant District Council No. 9.

Eugene Victor, New York City, for defendants Young, Kittle and Drutman.

BRIEANT, District Judge.

These two civil actions were consolidated for trial and tried before me without a jury. The litigation relates generally to the job of Secretary-Treasurer of defendant District Council No. 9 (the "Council"), and determined but unsuccessful efforts by plaintiffs and others to (1) effectuate a "painters' section" within the District Council, or (2) circumscribe the functions of the Secretary-Treasurer, or (3) alter the method of his election.

Plaintiffs Fritsch and Rossiter in 67 Civ. 3147 are rank and file members of Local 454, a local union affiliated with the Council. Plaintiff Schonfeld in 70 Civ. 2544 is a member of Local 1011, a local union affiliated with the Council, and is now serving as Secretary-Treasurer of the Council, having been elected to that office in June, 1967 and again in June, 1970. His position is that of chief executive officer of the Council, and he is the only Council official elected directly by the general membership of the constituent locals.

Defendant International Brotherhood of Painters & Allied Trades, AFL–CIO (the "International") is an international labor organization consisting of approximately 1400 local unions and about 70 district councils. Defendant Council is a regional labor organization of local unions and a subordinate body of the International. The International and the Council are each labor organizations within the meaning of § 3(i) of the Labor Management Reporting and Disclosure Act of 1959 [29 U.S.C. § 402(i)]. Council has its principal office in this District. Its jurisdiction extends to Manhattan, the Bronx, Brooklyn, Queens and Staten Island.

Defendant S. Frank Raftery is President of the International, and defendant Michael Di Silvestro is the Vice President thereof.[1]

1. Defendants Young, who was President of the Council, and Drutman, who was a member of Local 261, affiliated with the Council, have died since this litigation began. Defendant Kittle is or was a member and President of another constituent local. As to the claims against these defendants, which are not here adjudicated, see *infra*, p. 395 et seq.

Defendant Damery's trusteeship has previously been terminated, effective June 1967, by an order of District Judge Frankel (cited herein as Schonfeld I). No claim has been alleged against him individually. Morris Levy is now President of the Council, in place of defendant Caputo. Although the pre-trial order herein made June 15, 1972 did not provide for his substitution, he has been treated as a party for all necessary purposes.

Jurisdiction is founded on § 102 of the LMRDA of 1959, 29 U.S.C. § 412. Judge *Lasker* of this Court held, in denying a motion to dismiss the complaint in Schonfeld v. Raftery, D.C., 335 F. Supp. 846 (70 Civ. 2544) that this Court has subject matter jurisdiction under 29 U.S.C. § 412. Judge Lasker also held that these actions are not barred, either by *res judicata* or collateral estoppel by previous decisions in Robins v. Rarback, 325 F.2d 929 (2d Cir. 1963), cert. denied, 379 U.S. 974, 85 S.Ct. 670, 13 L. Ed.2d 565; Schonfeld v. Caputo, 61 Civ. 2223 (S.D.N.Y. June 12, 1964); or a prior case also entitled Schonfeld v. Raftery, 271 F.Supp. 128 (S.D.N.Y.1967) ("Schonfeld I"). The question of subject matter jurisdiction remains a difficult one, and is considered *infra*, p. 390, et seq.

*Organizational Structure.*

The Council is composed of about 28 local unions affiliated with the International. Plaintiffs classify seven of these as "autonomous" locals: Local 206 (glass handlers), Local 230 (sign writers), Local 806 (steel and bridge painters), Local 829 (scenic artists), Local 1087 (glaziers), Local 1456 (maintenance painters) and Local 1974 (tapers). Twenty-one locals composed of painters and paperhangers are designed in the complaint as "painters'" locals: Nos. 51, 121, 261, 442, 454, 472, 490, 509, 645, 795, 803, 848, 874, 893, 905, 977, 1011, 1035, 1507, 1511 and 1969.

The classification of "autonomous" contrasted with "painters'" locals is a somewhat artificial, but important distinction adopted by plaintiffs for purposes of this litigation.

A primary but not complete differentiation between autonomous and painters locals is found in the per capita payments made by the locals for support of the Council. Most bodies characterized as painters' locals pay $3.00 per member per month, plus administrative dues equal to 1% of each member's gross wages. This averages $9.00 per month. Most autonomous locals pay only $.10

per member per month. However, Local 1969, consisting of painters employed through civil service, alleged to be a painters' local, pays $5.00 per member per month. It bargains through the Council, but the Council does not pay the salary of or provide a business agent. Local 977 also claimed to be a painters' local, pays $.10 plus 1%, and also has no business agent provided by the Council. Its member are employed as decorators, muralists and do graining and marbelizing, at wages generally higher than received by other painters. Local 1456, whose members are engaged as maintenance painters in hotels and large complexes, which is considered autonomous by plaintiffs, pays $5.00 per capita, but the Council does pay its Business Agent.

The relationship of the autonomous locals to the Council differs in several respects from that of the painters' locals. The basic collective bargaining agreement governing the wages and working conditions of the painters' locals in the jurisdiction, known as the "Trade Agreement", is negotiated by the Council with the Association of Master Painters and Decorators of the City of New York, Inc. The Council generally does not engage in collective bargaining on behalf of the autonomous locals, which negotiate and administer their own collective bargaining agreements with employers. The autonomous locals need not obtain approval of the Council of the terms of such agreements.

The paperhangers present an exception. They bargain autonomously, for terms which are included as a separate provision within the Trade Agreement, some of the general terms of which are also applicable to paperhangers. Yet, paperhangers pay the same full per capita as painters, and their business agent is paid by the Council.

The autonomous locals for the most part maintain their own insurance funds separate and apart from the Painting Industry Insurance Fund, which is administered by the Council for the benefit of members of the painters' locals.

The record does not permit a satisfactory resolution of the question "[h]ow is the question of whether a particular local is, or is not, autonomous, to be determined?" We think the best index is whether the Council controls collective bargaining, or pays and supervises the Business Agent. Some are clearly hybrid or semi-autonomous by this criterion. But for purposes of these findings, we adopt plaintiffs' admittedly imperfect classification, believing that the failure of perfect symmetry is, for our purposes, unimportant.

All locals elect delegates to the Council. The number of delegates is determined by the size of the membership of the local. Each local is entitled to one Council delegate. A local of 100–499 members has two, a local of 500–999 members has three, and locals having membership of 1,000 will be represented by four delegates on the Council, with an additional delegate for each 500 members or major fraction over 1,000. The painters' locals, whose total membership on June 30, 1972 was 8,292, are represented on the Council by 49 delegates. The autonomous locals, whose total membership on June 30, 1972 was 4,449, are represented on the Council by 17 delegates. The autonomous local delegates comprise slightly more than 25%

of the total number of Council delegates.[2] The delegates function as the legislative body of the Council. Almost all actions of the Council must be approved or authorized by a majority vote of the Council delegates.

The Council delegates also elect all officers of the Council, with one exception, the Secretary-Treasurer. The delegates elect the President and Vice-President of the Council, the three trustees and the Warden. The Secretary-Treasurer of the Council is the only officer of the Council who is elected directly by the membership of each local affiliated with the Council. The members of both the painters' and autonomous locals vote in elections for the office of Secretary-Treasurer, and members of autonomous locals as well as of painters' locals are eligible to be nominated and elected to that office. Nomination is made by a local union, rather than by members or groups of members.[3]

*The Position of Secretary-Treasurer— Its Significance.*

Just as does any representative body, the Council functions in part according to the formal provisions of its By-Laws, and in part by the observance of time-honored, unwritten customs and traditions. It is from both sources that we must ascertain the duties and powers of

2. Thus, in an election for the office of Secretary-Treasurer, more than one-third of the eligible voters are members of autonomous locals, which hold 25% of the delegate voting strength on the Council.

3. Article X, Section 1 of the Council By-Laws reads as follows:

"ARTICLE X
Nominations and Elections
Section 1. The Secretary-Treasurer of the Council shall be elected by the members of the affiliated local unions for a term of three (3) years. Each local union, including Local, 490 and other autonomous local unions, shall have the right to nominate one candidate as a candidate for said office. A candidate for Secretary-Treasurer need not be a member of the local which nominates him. To be eligible for nomination for said office, a member must be

a citizen of the United States who has been a member in continuous good standing in the Brotherhood for a period of at least three (3) years of a local affiliated with the District Council 9 preceding the date of his nomination, and who has worked at some branch of the trade as a journeyman for a period of one (1) year prior to the date of nomination, in accordance with the provisions of Section 172 of the Constitution. The latter two qualifications shall not be applied, however, to candidates nominated by local unions chartered less than a year prior to the date of nomination, or to candidates who are in the service of their local union, District Council or Brotherhood in an official capacity, which shall have prevented them from actively following any branch of the trade for at least one (1) year preceding the date of their nomination."

the Secretary-Treasurer, and its significance.

The By-Laws, (Exhibit F–2) provide that the Secretary-Treasurer may call special meetings of the District Council (IV–5), he shall not be eligible to be a delegate to the Council (V–3), the Council may delegate to the Secretary-Treasurer the power to order job or shop strikes, such power to be exercised in conjunction with any of the Business Agents,[4] he may appoint not more than one assistant from a local union and is elected for a three year term (VII–3, 4).

As the Secretary-Treasurer is the only full-time officer of the Council, it is not surprising that Section 7 of Article VII requires him to receive daily reports of the Business Agents, and to make a detailed record to read at the weekly meetings of the Council; to maintain a file of all shop reports and complaints from members and keep the Business Agents informed of all matters that will assist them in the discharge of their duties.

In addition, he has the normal functions of a Secretary and Treasurer, keeping a correct record of the proceedings and orders of the Council, attesting all money orders drawn on the Council and recording communications, the names and addresses of the delegates and committees, preparation of the minutes, and a record of out-of-town employers functioning within the district, all as required by Section 7 of Article VII. In this latter connection he is required to "see to it that at least 75% of the members employed on jobs of such [out-of-town] employers are members of local unions affiliated with the Council" (ibid); he receives all monies, and records the names of all applicants for membership and of all apprentices, and is bonded in the amount of $50,000.00. He is authorized to appoint an Assistant Secretary "from amongst the elected Business Agents" (ibid).

The importance of the position is recognized by Section 12 of Article VII, which provides that in the event of death, resignation or removal, a temporary Secretary-Treasurer may be appointed for a period not exceeding four weeks during which period "the Council shall send out to the local unions for a referendum vote to determine whether an election for Secretary-Treasurer shall be held by the members, or whether the appointee shall fill the vacancy for the duration of the unexpired term".

Business Agents must make daily written reports to the Secretary-Treasurer (VII–2) and he presides over the regular weekly Business Agents meeting, and prefers charges against Business Agents accused of wrongdoing. All violations of the Trade Agreement are reported to the Secretary-Treasurer. The Secretary-Treasurer investigates these violations and prefers charges [XI–27(b)].

The Trade Agreement regulating the painters' wages and working conditions is negotiated by the Council's Agreement Committee. This Committee is composed of one representative of each painters' local. The Secretary-Treasurer has not in practice been a "voting member" of this Committee. However, he does make recommendations to the Agreement Committee as to the substantive and tactical positions it should take in the complex and highly stylized collective bargaining process. In practice, the Secretary-Treasurer usually acts as the chief spokesman for the Agreement Committee in its negotiations with the employers association.

The Secretary-Treasurer "certifies" the shop stewards and job stewards of the painters' locals. He has the power

---

4. As to this essential aspect of the day to day enforcement of the Trade Agreement, the Secretary-Treasurer is granted a broad discretionary power under Article VI, Section 3, although the By-Laws also provide in the same section that only Council delegates from the local unions covered by the Trade Agreement may vote to order job or shop strikes.

to withhold a certification. The Secretary-Treasurer appoints the union representative to the Joint Trade Board and the Joint Coordinating Committee, union-employer committees which supervise and regulate enforcement of the Trade Agreement. The Secretary-Treasurer presents the union position in any arbitration under the Trade Agreement.

The Secretary-Treasurer also acts as co-chairman of the Joint Industry Board, a union-employer board which makes and implements rules and regulations governing working conditions of the painters which, however, may not be inconsistent with the Trade Agreement.

The Secretary-Treasurer assigns the Business Agents of the painters' locals to designated territories and duties, and rotates or changes their assignments from time to time in order to forestall corruption.[5]

The By-Laws indicate the importance of the Secretary-Treasurer's job to all constituent local unions and the members thereof. They also sustain plaintiffs' assertions that the functions of the Secretary-Treasurer and the manner in which his work is performed is of a special significance to the painters' locals, since he is of necessity concerned with the day to day enforcement of the Trade Agreement, a matter of much less significance to the members of autonomous locals.

Leaving the By-Laws and viewing the position from a practical aspect, it must be obvious that any Secretary-Treasurer under the framework and organization of the Council is confronted daily with issues which arise between Business Agents and members of the painters' locals, between Business Agents and employers, between local unions and between locals and the Council.

Many of such matters obviously are settled according to precedent and tradition, or by discussion, compromise and informal resolution of controversies, all as a part of the day to day operations of the job of Secretary-Treasurer. The cumulative effect of this quasi-judicial function in the trade, performed regularly by the Secretary-Treasurer, is vital to the craft; how it is done can advance or set back working conditions as much or more, in the long run, than can achievements or failures at the bargaining table.

It is natural that plaintiffs and members of painters' locals would be concerned that this position should not, by election, fall into the hands of a person belonging to an autonomous local, engaged in an allied trade, and not directly affected by the Trade Agreement. This has not taken place, historically, since the autonomous locals were granted affiliation with the Council and voting rights, but this is not to say that such a result could not ensue.[6]

*A Substantial Question is Raised.*

It follows that plaintiffs have raised a substantial question, which at least in theory affects directly, the conduct of their collective bargaining and administration of their union affairs. Plaintiffs are aggrieved by the existing structure, in that persons in autonomous locals whose collective bargaining is *not* administered by the Secretary-Treasurer, have considerable weight in his election, which they, voting as a bloc with a minority of the painters, could effect, possibly against the wishes and opinions of those whose rights are so affected.

---

5. This practice is not followed in Brooklyn and Queens. Also, by agreement, the present incumbent apparently has surrendered some of his power to reassign, elsewhere, or allowed it to remain unexercised.

6. There is no obstacle to such consequence, and very little post-LMRDA history to guide us. For many years, from 1946 until October 19, 1966, the Council was operated under the one-man rule of Martin Rarback, "corrupt and autocratic" (*Schonfeld I*, p. 130 of 271 F.Supp.) by whom affairs were "dictatorily and repressively run" (*Schonfeld III*, fn. 2, p. 901 of 477 F.2d 899). From 1966 until the election of Schonfeld as Secretary-Treasurer, union affairs were controlled by an International imposed Trusteeship.

It remains to be determined, however, what the solution is for this problem; is it cognizable under Title I of the LMRDA? If so, what is the nature and extent of the practicable judicial remedy which may be granted? Have plaintiffs exhausted their intra-union remedies?

*Intra-Union Procedures.*

In early 1969, the so-called "painters' section amendment" to Council By-Laws, was submitted to a referendum vote. Only the members of painters' locals were permitted to vote in that referendum. On February 14, 1969, the paint-ers' section amendment to the Council By-Laws was approved by the painters' locals by a vote of 1,627 to 731.

The International constitution gives the General Executive Board ("GEB") of the International power to declare invalid, amendments to District Council By-Laws which it determines are in violation of the International constitution. On June 18, 1969, it did so. The GEB issued a letter opinion finding that the painters' section amendment contravened Section 9 of the International constitution. This section reads in pertinent part as follows:

"This Brotherhood shall be governed by the following bodies:

(1) General Convention.     (3) General Officers.
(2) General Executive Board.     (4) District Council.
                (5) Local Unions."

The GEB interprets this provision as prohibiting creation of a governing body in addition to those specifically enumerated in Section 9.

On or about July 1, 1969, the Council appealed that GEB decision. The appeal was laid before a General Convention of the International, pursuant to Sections 285 and 286 of the International constitution. The convention was held in Bal Harbour, Florida in August, 1969. Schonfeld was a delegate to that convention. He and other delegates were heard in support of the painters' section amendment on the convention floor. The convention affirmed the decision of the GEB by voice vote, sustaining the recommendation of the convention's Appeals Committee.

The construction so placed upon its constitutional provision by the International seems inherently reasonable and correct. The constitutional provision sought to be sustained by rejecting the proposed painters' section amendment likewise seems to the Court to set forth a perfectly reasonable and proper policy on the part of the International, which may well wish to avoid further and future subinfeudation of union power.

We are told that the GEB's interpretation of Section 9 is unfair and arbitrary, because three governing bodies other than District Councils, and other than those enumerated in the Section, have been recognized elsewhere by the International as lawful subordinate bodies. Two of these, the "Joint Executive Committee" of Brooklyn and that of Queens, were directed by the International in 1962 to affiliate with District Council No. 9, and did so. Plaintiff Schonfeld admitted that such affiliation was required under the constitution. He also testified that the General Executive Board had granted a charter to the "Northern California Resilient Flooring Association" which would seem to have been in violation of Section 9, but was unable to testify as to when and under what circumstances such a charter was granted. There is no evidence to indicate that the Resilient Flooring group is similar to the proposed painters' section either in its structure or function. There is a failure of proof that the International has interpreted Section 9 in a different manner than it did in applying it to the proposed painters' section By-Law amendment.

Regular union procedures were followed with respect to the appeals concerning the painters' section amendment. I refuse to find that the GEB or the International acted unfairly or unreasonable in connection therewith. The presence of Zucker, a New York employer, on the convention floor is of no significance, and plaintiffs failed to make timely protest.

■ A Court should be exceedingly reluctant to substitute its judgment for that of union officials in the interpretation of the union's constitution, and should interfere only where the official interpretation is unfair or unreasonable. Vestal v. Hoffa, 451 F.2d 706 (6th Cir. 1971), cert. denied, 406 U.S. 934, 92 S. Ct. 1768, 32 L.Ed.2d 135. In Gurton v. Arons, 339 F.2d 371 (2d Cir. 1964), the Court of Appeals upheld the International Executive Board of the American Federation of Musicians in voiding resolutions adopted by a subordinate body with respect to the election of officers. The Court held (p. 375 of 339 F.2d):

"The provisions of the L.M.R.D.A. were not intended by Congress to constitute an invitation to the courts to intervene at will in the internal affairs of unions. Courts have no special expertise in the operation of unions which would justify a broad power to interfere. The internal operations of unions are to be left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the Act."

7. Complaint, p. 23, ¶ 2. As to this aspect of the controversy, we exercise pendent jurisdiction. Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971). A state court could adjudicate this issue, and would do so with respect to an unincorporated association. See for example the opinion of (then) Justice Breitel in Fritsch v. Rarback, 199 Misc. 356, 98 N.Y.S.2d 748 (Sup.N.Y.1950) a case involving the same District Council No. 9 presently before the Court. The LMRDA in § 103 expressly saves to suitors their state claims.

■■ As in *Gurton, supra,* we find that the provisions of the International constitution under which the GEB acted are not arbitrary or unreasonable, nor is the interpretation which has been placed thereupon.

■ For that reason and in reliance on *Gurton, supra,* that portion of the relief requested in these actions which seeks a declaratory judgment that the aforementioned acts of the GEB and the International convention are illegal and of no effect, and that the painters' section amendment to the District Council No. 9 By-Laws, approved by the Council membership on February 14, 1969, is valid, lawful and in conformity with law and the International's constitution, is denied on the merits.[7]

After the aforementioned failure to achieve implementation of the painters' section amendment, plaintiff Schonfeld in February 1970 submitted a new proposal for amendment of the District Council No. 9 By-Laws. This proposal, described by plaintiffs as "very complex", attempted to provide a greater measure of self-government to the painters, but also contained a provision which would have increased the per capita payments of the autonomous locals from 10 cents to One Dollar per month. Foreseeably, with the autonomous locals voting this time, the proposed by-law was defeated by a vote of 2,829 to 929.

We conclude the plaintiffs have exhausted their intra-union remedies.

*Declaratory Relief Sought.*

Plaintiffs now also seek a declaratory judgment that the present voting system

It may, at first glance, seem inconsistent to exercise pendent jurisdiction of a state claim, where perhaps we lack jurisdiction of the federal claims pleaded. The apparent inconsistency disappears when we note that there is a substantial identity of the facts pleaded, or a "common nucleus of operative facts", and also that it is an inexact analysis to describe, as do the decided cases, as want of subject matter jurisdiction that which is really a failure to state a claim. See p. 394 of this opinion.

in which the members of autonomous locals are permitted to vote for the Secretary-Treasurer of the Council deprives them of rights under § 101(a)(1) of LMRDA [29 U.S.C. § 411(a)(1)], which reads as follows:

> "Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

Plaintiffs contend that they have been deprived of their equal right to vote in elections, protected by Title I of the statute, as a result of the participation by the autonomous locals in selection of the Council Secretary-Treasurer. Plaintiffs also urge that permitting the members of the autonomous locals to vote for Secretary-Treasurer dilutes their vote in the choice of their collective bargaining representative, with no mutuality of participation, since painters do not vote for the collective bargaining representatives of the autonomous locals.

In addition, plaintiffs claim that § 101(a)(1) of LMRDA is violated by this voting method in that it gives the members of autonomous locals "two votes" [one for their own collective bargaining representatives and one for the Secretary-Treasurer who represents the painters in collective bargaining], while the members of the painters' locals have only one vote, the vote they cast for the office of Secretary-Treasurer. They phrase their demand in the modern rhetoric, for "One man—one vote".

There are understandable reasons for this grounded in history, as there are similar historical reasons for the existence of the large number of local unions of painters in New York. It would prolong this opinion unduly to detail all of these historical factors, out of which grew the current composition and organization of District Council No. 9, and we agree with plaintiffs' contention that no sanctity granted by age attaches to pre-1959 (and pre-LMRDA) union customs.

All parties to this litigation seem to agree that the problem would be ameliorated to a great extent if the painters' locals would merge into one single local, which they could do without violating any Council or International By-Law. Apparently, the members of the different locals work side by side, and any local member may work within the Council's jurisdictional area. We are told that the reason for the large number of painters' locals is that they were originally organized along neighborhood lines, or according to ethnic background or national origin.

Practical difficulties seem to prevent any voluntary merger of the painters' locals; the Council and its members are highly politicized and such a merger might eliminate elective and appointed positions. It is a fact of political life that few office holders are willing to vote their jobs or titles out of existence, and no strong incentive exists to impel any such merger or consolidation.[8]

---

8. An illustrative incident which assists in understanding the prevailing attitude in the Council and the degree of partisanship shown towards plaintiffs, is found in our unreported memorandum in *Schonfeld II*, dated April 28, 1972. There, we wrote in part:

> "On June 16, 1970, almost two years ago, plaintiff filed his complaint in this action, in which he described himself in the caption, as 'Frank Schonfeld individually and as Secretary-Treasurer of District Council 9, International Brotherhood of Painters & Allied Trades, AFL–CIO.' The defendants were S. Frank Raftery, as President of the International Brotherhood of Painters & Allied Trades, AFL–CIO, and others.
>
> By an Order of Judge Lasker of this Court, made November 24, 1971, District Council No. 9 of the International Brotherhood of Painters & Allied Trades, AFL–CIO, of which plaintiff is

It is reasonable to observe that the problem ought to be resolved within the Council as a result of Committee action, followed by a vote of the members and should be accomplished with the aid and assistance of the International.

Mr. S. Frank Raftery, International President, attended the trial, and testified for the defense. He showed that there were approximately 70 District Councils in the International, normally structured similarly to District Council No. 9; "the structure being a composition of mixed local unions, or painters' local unions, if you will, and a number of autonomous or special branch local unions, varying area by area, city by city, across the nation." (p. 439 of trial tr.) He explained the need for District Councils as ". . . a hub upon which could revolve all of the affairs of the local unions in a particular geographical area, where they may have a common interest, particularly in the area of legislative activities, activities as they apply to the community, other types of general things that would be in the general interests of the membership in that particular area." These interests he said included organizing, educa-tion, policing of jobs and affiliations with building trade councils, state federations and so on. There is no indicated desire on the part of the International to obstruct reform, provided only that a "painters' section" created as a subordinate body in the Council may not be permitted.

*Jurisdictional Problems.*

As noted before (*supra*, p. 383), the question of subject matter jurisdiction presents difficulty. Plaintiffs cite no case in which a court has exercised Title I jurisdiction to restructure the eligibility to hold union office in the drastic manner which would be required here. Judge *Lasker* in his prior decision upholding subject matter jurisdiction held (Schonfeld v. Raftery, D.C., 335 F.Supp. 846, 850):

"[W]e hold that [the claims present-ed] properly allege violations of rights guaranteed in § 101 of the LMRDA and do not involve the conduct of any specific election for which Title IV is provided as the sole avenue for redress of grievances.

Plaintiff rests his claims on the grant of 'equal rights and privileges

Secretary-Treasurer, was added as a party *defendant* in this action.

\*      \*      \*      \*      \*

By motion dated April 4, 1972, the Court is now asked to make an Order 'removing as a plaintiff in this action, Frank Schonfeld in his capacity as Secretary-Treasurer of District Council No. 9 . . ., and amending the caption of this action accordingly by striking therefrom the words "and as Secretary-Treasurer of District Council No. 9 . . .".'

. . . At a District Council meeting held December 14, 1971, it was resolved as follows:
'The lawsuit concerning the painters' section was brought by Frank Schonfeld in two capacities: as an individual and as Secretary-Treasurer of District Council No. 9. By suing in his official capacity, he in effect made— or created the appearance of making— District Council No. 9 a plaintiff in the action. The Council never gave him authority to sue on behalf of the Council. Moreover, now that District Coun-cil No. 9 is a defendant in the action, it is preposterous and harmful to the Council's interests to have the caption continue to indicate that the Council is one of the plaintiffs as well. Therefore, I move that the Council instruct Frank Schonfeld to amend the caption immediately to eliminate his name in his official capacity. The caption should state as plaintiffs simply Frank Schonfeld, an individual. I further move that this resolution be printed in the minutes of this Council meeting verbatim.'
The resolution was carried by 24 'Yes' votes and three negative votes. There was some suggestion, not supported by affidavit or concession, that the District Council proposes to discipline Schonfeld if he does not comply with the resolution."
A labor organization so vitally concerned about such a small matter as the caption of this action is certain to have difficulty resolving major issues amicably and with the use of common sense.

. . . to vote in elections . . . subject to reasonable rules and regulations . .' Plaintiff's allegations that this guarantee in § 101(a) is violated by the voting system (as distinct from the conduct of that system) and the division of negotiating authority are within the scope of Title I. Because the allegations as to any specific election are moot, we have no occasion here to decide whether these claims (eighth cause of action) would have fallen outside of the jurisdiction of § 102 and within that of the Secretary of Labor under Title IV."

The foregoing findings are not binding, although entitled to great weight. The doctrine of "law of the case" is not an imperative. We may apply recent precedent and invoke a new analysis of subject matter jurisdiction, upon a complete factual record after trial. Dictograph Products Co. v. Sonotone Corporation, 230 F.2d 131, 134 (2d Cir. 1956); Uniformed S. M. Ass'n Inc. v. Commissioner of S. of N. Y., 426 F.2d 619, 628 (2d Cir. 1970), cert. denied, 403 U.S. 917, 91 S.Ct. 2223, 29 L.Ed.2d 693.

There is reason to believe that a pre-election voting eligibility issue, which this is, with the unusual twist that too many are eligible to vote, diluting plaintiffs' votes, rather than that a class has been denied voting rights, would today be regarded as a Title IV case, not directly justiciable at the instance of a rank and file union member, by-passing the Secretary of Labor.

Enactment of any reform legislation, as LMRDA was, contains input from varying special interests and points of view. Often, when federal legislation is enacted to effectuate reforms in human conduct, we are reminded of the aphorism expressed with reference to the Volstead Act, that "the Drys had the law they wanted, and the Wets had all the liquor they wanted to drink". So it is with LMRDA. As originally introduced in the Senate in 1959 under the name of the Kennedy-Ervin Bill (S #1555) there was no provision for any individual member suits to be brought directly in the district courts. The legislation's purposes to achieve greater internal union democracy and eliminate racketeering were entrusted entirely to the "administrative expertise" of the Secretary of Labor.

At the insistence of Senator Kuchel and others, the legislation was amended on the floor of the Senate. On April 24, 1959, Senator Kuchel offered the amendment which included present Section 102, and he said with respect to it (p. 1232 Cong.Rec.Senate, April 25, 1959):

"As will be recalled from my earlier comments, here is one of the major changes in the proposal. The [prior] amendment . . . provided that the Secretary of Labor might, on behalf of the injured or aggrieved member, have the right to litigate the alleged grievance and to seek an injunction or other relief. We believe that giving this type of right to the aggrieved employee member himself is in the interest of justice, and therefore we propose to eliminate from the bill the right of the Secretary of Labor to sue in his behalf."

Senator Clark (p. 1233), a co-sponsor of the Kuchel amendment, said:

". . . it takes the Federal bureaucracy out of this bill of rights and leaves its enforcement to union members, aided by the courts."

As finally enacted, the legislation permitted members to enforce the "bill of rights" under Title I, but limited access to this Court in voting cases under Title IV to the Secretary of Labor.

Almost any conceivable dispute or form of oppression within a union other than a denial of free speech, improper discipline or exclusion from participation in meetings, involves "voting rights" and may be called a Title IV claim. Any such dispute may be cast in terms of either pre-election or post-election, or concerns the outcome or conduct of an election. It is too late in the history of the Act to claim that where there is no actual election being conduct-

ed, problems related to voting rights may be adjudicated under Title I.

Section 101(a)(1) thereof, quoted *supra,* p. 389, by its plain meaning, includes plaintiffs' claims. However, their claims are also comprised in § 401(e) of Title. IV which prescribes that "Each member in good standing shall be entitled to one vote." The case is stated in Mr. Schonfeld's brief as:

> "the autonomous local members have two votes (one, for the Secretary-Treasurer, and one for their own officers); the painters have, on the other hand, but one vote. They do not vote for autonomous local officers. This is the inequality."

The Kuchel amendment has been gutted, insofar as its plain meaning permits immediate recourse to a federal court under Title I to sustain a "one man, one vote claim". This began with Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). What the majority opinion there accomplished is best explained by the concurring opinion (p. 141, 85 S.Ct. p. 297):

> "At issue are subtle questions concerning the interplay between Title I and Title IV of that Act. In part, both seem to deal with the same subject matter: Title I guarantees 'equal rights and privileges . . . to nominate candidates'; Title IV provides that 'a reasonable opportunity shall be given for the nomination of candidates.' Where the two Titles of the legislation differ most substantially is in the remedies they provide. If a Title I right is at issue, the allegedly aggrieved union member has direct, virtually immediate recourse to a federal court to obtain an adjudication of his claim and an injunction if his complaint has merit. 73 Stat. 523, 29 U.S.C. § 412 (1958 ed., Supp. V). Vindication of claims under Title IV may be much more onerous. Federal-court suits can be brought only by the Secretary of Labor, and then, only after the election has been held. An additional barrier is thus placed between the union member and the federal court. Remedies shape the significance of rights, and I think the Court too casually forecloses the direct access to a federal court which the Court of Appeals held was given these respondents by Congress.

> \* \* \* \* \* \*

> After today, simply by framing its discriminatory rules in terms of eligibility, a union can immunize itself from pre-election attack in a federal court even though it makes deep incursions on the equal right of its members to nominate, to vote, and to participate in the union's internal affairs.

> The Court justifies this conclusion by looking to the 'structure and language' of the Act. The language is certainly not free from doubt. And the legislative history indicates that the structure can be misleading.

> \* \* \* \* \* \*

> By reading Title I rights so narrowly, and by construing Title IV to foreclose absolutely pre-election litigation in the federal courts, the Court sharply reduces meaningful protection for many of the rights which Congress was so assiduous to create."

In Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), a rank and file member was permitted to intervene in a Title IV case brought in the first instance by the Secretary of Labor. But the Supreme Court, Mr. Justice Douglas dissenting, there excluded a new claim which the intervenor, but not the Secretary, desired to assert—a claim factually similar to the present case. Intervenors asserted their vote was being diluted by permitting "so-called 'bogus' locals composed entirely of pensioners, which were 'run' by the incumbents" to vote with them. (See fn. pp. 530 and 540 of 404 U.S., p. 637 of 92 S.Ct.)

In Sargent v. United Transportation Union, 333 F.Supp. 956 (W.D.N.Y.1971) a claim of disproportionate representation (one man—one vote) was dismissed

on jurisdictional grounds. Judge *Curtin* held (p. 957):

> "Relying upon the broad language of Title I with respect to voting rights, and pointing to the union members's private remedy provided in Title 29, United States Code, Section 412, the plaintiff takes the position that recourse through the Secretary of Labor is unnecessary and improper.
>
> The defendant, on the other hand, has pointed to language in the provisions of Title IV which would indicate that relief must be sought through the Secretary of Labor.
>
> [T]he inquiry must go further than the overlapping and uncertain language of the Act. The policy of Congress is one of minimal intervention with union elections. Wirtz v. Local 153, Glass Bottle Blowers Assn., 389 U.S. 463, 470, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). Within this policy,
>
> Congress * * * intended the district courts to move at the instance of private litigants in cases of fraud and willful breach of fiduciary duty and gross misconduct, but to go carefully and slowly, before intervening, except at the instance of the Secretary, where differentiation of the licit from the illicit entails expertise and where premature intervention would interfere with or discourage real prospects of internal relief or reform. Ratner, *The Emergent Role of District Courts In National Labor Policy*, 38 F.R.D. 81 (1965)."

Any doubt that our Circuit would deem this pre-election case cognizable only under Title IV in a suit to be brought by the Secretary of Labor, would seem to be eliminated by the recent decision in Schonfeld v. Penza, 477 F.2d 899 (1973) hereinafter *"Schonfeld III"*. There the Court held:

> "In Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), the Court held that the Secretary could not be by-passed and that Title I rights were '[p]lainly . . . no more than a command that members

and classes of members shall not be *discriminated against* in their right to nominate and vote.' 379 U.S. at 139, 85 S.Ct. at 295 (emphasis supplied). The concurring opinion (Stewart and Harlan, JJ.) thought this too narrow a construction of Title I and that 'there are occasions when eligibility provisions can infringe upon the right to nominate,' or more accurately as the opinion put it subsequently, 'the equal right to nominate.' 379 U.S. at 143, 85 S.Ct. 292.

> \* \* \* \* \* \*

> The competing values between Title I rights and Title IV procedural requirements are best reconciled, in our opinion, by limiting initial federal court intervention to cases where union action abridging both Title I and Title IV can be fairly said, as a result of established union history or articulated policy, to be part of a purposeful and deliberate attempt by union officials to suppress' dissent within the union."

Plaintiffs have cited Title I cases, all of which involved the actual denial of any right to vote, to a particular union member, or to a designated class of union members. For example, Acevedo v. Bookbinders & Machine Operators Local No. 25, 196 F.Supp. 308 (S.D.N.Y.1961) involved the permanent denial to members of the union designated as class B members of the right to vote for certain officers. Similarly, Hughes v. Local No. 11 of International Association of Bridge, Structural and Ornamental Iron-Workers, 287 F.2d 810 (3rd Cir.), cert. denied, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961), and Ferger v. Local 483 of International Association of Bridge, Structural and Ornamental Iron Workers, D.C., 238 F.Supp. 1016, aff'd, 342 F.2d 430 (3rd Cir. 1965) involved the denial of any voting rights to plaintiffs who had fulfilled all of the membership requirements of a local but had been denied a transfer to that local.

Plaintiffs contend that § 101(a)(1) establishes the "one man—one vote" standard for union voting systems.

American Federation of Musicians v. Wittstein, 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964) stands for the principle that Congress did not intend by enacting Title I of the LMRDA to compel labor unions to adhere strictly to a "one man—one vote" electoral system. The Court stated (379 U.S. at 181, 85 S.Ct. at 306):

> "We find nothing to indicate that Congress thought this objective would be better fulfilled by allowing a delegate to cast one vote, regardless of the size of his constituency, than by permitting him to cast a vote equal to the number of members he represents."

We conclude, after a full trial record which was not before Judge Lasker, and in reliance on the foregoing authorities, many of which were decided after his aforementioned opinion denying the motion to dismiss Schonfeld II, that this litigation presents issues cognizable only under Title IV, § 401(e) of LMRDA, as to which there may be no access to this Court which by-passes the Secretary of Labor. We reach this conclusion regretfully, and intending no criticism or disrespect for his well reasoned opinion which seems to reflect more fairly the real intent of Congress. Congress, however, has allowed *Calhoon* to remain on the books, undisturbed by further remedial legislation, for almost a decade, after its effect had been spotlighted by the concurring opinion therein.[9]

We speak in terms of lack of "jurisdiction" simply because the decided cases do so. *Cf. Schonfeld III, supra.* We recognize however, as was suggested, but not decided, in *Calhoon* (fn. 9, p. 137 of 379 U.S., 292 of 85 S.Ct.) what is actually involved here is a failure to state or prove a proper cause of action arising under federal law, which calls for a judgment on the merits, and not a dismissal under Rule 12(h)(3), F.R.Civ.P., for want of jurisdiction. By reason of the authorities cited, we find that plaintiffs do not state a Title I claim, but rather a Title IV claim, cognizable in this Court only at the instance of the Secretary of Labor.

*Available Relief on the Merits.*

Because subject matter jurisdiction is a close question, and because this long standing litigation has been costly and divisive to the Council, its constituent unions and to the craft, we will consider briefly the matter of available relief on the merits. This we do for the added purpose that the parties, and a Court exercising appellate review, may have a full record.

The Secretary-Treasurer's duties are not confined exclusively to matters affecting only the painters' locals. If plaintiffs' request that the Court declare it violative of § 101(a)(1) to allow members of autonomous locals to vote for the Secretary-Treasurer were granted, such relief would result in the very situation which, as noted, has been held consistently to violate Title I. Such a result would create a permanent class of members, the members of autonomous locals, not entitled to vote for the office of their Secretary-Treasurer of the Council, who performs at least some official duties with respect to their labor representation.

9. Plaintiffs Fritsch and Rossiter, in their post-trial memorandum, at page 25, put it thus:

> "What defendants are saying is that Congress spent four years hammering out a statute designed to guarantee union democracy; that it enacted a section which it headed 'Bill of Rights' (with all the historical connotations of that phrase) which gave to union members, among other guaranties, the guaranty of the right to an equal vote; that Congress, moreover, specifically provided (in Section 102) that 'any person' whose rights were violated might bring an action for relief in this Court. Nonetheless—say defendants—Congress did not mean it. Congress has labored and brought forth a mouse. The so-called Bill of Rights and the grant of jurisdiction to enforce them are a fraud and a jape."

Even so—see the analysis and language of the Court of Appeals quoted from *Schonfeld III*, at page 393 hereof.

Were it not for the jurisdictional difficulty, we would adjudge and declare under all the factual circumstances of this case that it is an unlawful dilution of the voting rights of members of painters' locals, to permit election by vote of autonomous local members, of an officer so intimately concerned with the collective bargaining activity of the painters.

Once having so declared, we would face the quandary—what remedy is to be granted, and how effected?

It would be reasonable to follow the procedure used in one man—one vote litigation in the policical area, that is, to declare the rights of the parties to a reapportionment of political power, and grant a reasonable time for the malapportioned legislature to correct its own inequities, failing which the Court would do so. *Cf.* WMCA, Inc. v. Lomenzo, D.C., 238 F.Supp. 916, 918.

But what would the Court then do? We are reluctant to concede that a wrong exists without a remedy, ever. But we could not disenfranchise the autonomous locals in their choice of such an important council official. The "painters' section" proposal has been discussed, *supra*, p. 386, and found wanting. Enforced merger of the painters' locals, with a consequent shifting of the collective bargaining function downward from the Council to a new, autonomous painters local, does not appear practical, and would deprive the membership of rights of self-determination as important as their one-vote right, or more so.

The problem could be solved by splitting the Secretary-Treasurer's position into two jobs; one person elected by all and acting only in general Council business, and the other elected only by the painters' locals and acting as a sort of Coordinating Business Agent, solely in matters affecting the Trade Agreement. But jurisdictional arguments between these two may raise difficulty, as not all the daily issues arising at the Council offices are so clear cut, and there is grave question whether we should compel a labor organization so to double its number of permanent full-time elected officials, with resultant increase in its administrative overhead.

Possibly there are other solutions which could be enacted by the Council electorate. Here, the International officers should be prepared to take a hand, conciliate and offer suggestions. Perhaps, but for the long history of rancor and litigation detailed by this Court and recognized by the Court of Appeals in *Schonfeld III*, this would have been accomplished by now.

We note in closing that plaintiffs do not claim that the actions of the Secretary-Treasurer (Schonfeld) since the Damery trusteeship was concluded by Judge Frankel's order have resulted in any breach or failure to discharge the duty of fair representation. Nor has the elective system resulted in the choice of a non-painter (or, more correctly, a member of an autonomous local) as Secretary-Treasurer.

The twin evils of corruption and repression which characterized the Rarback regime, and were detailed in *Schonfeld III* may not be attributed to the challenged electoral system. Rarback attained power prior to the enactment of LMRDA, and I decline to find that the admission of autonomous locals to the Council was effected in order to ensure continued power for Rarback's repressive regime. There is no evidence which shows that Rarback received such a benefit, but if so, it was incidental to a perfectly legitimate purpose of the International to have affiliated into one district council, as many as possible of its locals in the geographic area, in order that such goals as fostering legislation and organization of non-union workers, participation in community affairs, and promotion of inter-local harmony could be advanced as well as for administration of the joint trade agreement.

*Other Matters.*

At the start of trial, it was stated that defendants Young and Drutman, sued individually and as Council offi-

cers, were deceased. Plaintiff Schonfeld consented in substance to discontinue without prejudice against them (Trial tr. pp. 6 and 9) and that is directed.

The claim pleaded against Kittle has been severed and remains outstanding.

This litigation was brought and defended in good faith by all parties, notwithstanding the lamentable record of conduct in this labor organization, characterized in *Schonfeld III* by the Court of Appeals as reminiscent of the Hatfields and McCoys.[10] Accordingly, the judgment to be entered herein will be without costs.

*Conclusion.*

The Court has jurisdiction, and finds that defendant International and its officers sued here acted properly and in good faith in their interpretation, sustained by the general convention, that the proposed "painters' section" by-law adopted in 1969 was in conflict with the International constitution and declines to declare that the by-law was validly adopted and in full force and effect (see *supra,* p. 388).

Plaintiffs' other claims with respect to the method of selection of the Secretary-Treasurer, and the scope of his authority are not cognizable in this Court under Title I, LMRDA at the suit of plaintiffs, but may be litigated at the instance of the Secretary of Labor pursuant to Title IV thereof. As to that part of the litigation, all relief shall be denied, for want of jurisdiction, or expressed more exactly, because plaintiffs do not state a claim upon which relief can be granted. That disposition is without prejudice to the rights of the Secretary of Labor or any other parties as intervenors or defendants, in a Title IV action, or otherwise.[11]

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. There is no just reason for delay. Rule 54(b), F.R.Civ. P. A final judgment in accordance herewith as to all claims and parties, except with respect to Schonfeld's claim against Kittle in 70 Civ. 2544, which has been severed, shall be settled on fifteen (15) days notice. As plaintiffs in the related action entitled Schwartz et al. v. Levy, 72 Civ. 4971, which has been litigated in part together with *Schonfeld III* have indicated an interest in this litigation and a desire to intervene here as parties plaintiff, the Court directs notice of settlement of any proposed judgment shall also be served on all counsel of record in the *Schwartz* action.

---

10. The parallel is exact. In fn. 2 of *Schonfeld III*, the Court of Appeals (per Circuit Judge Oakes) summarized approximately eleven separate lawsuits, including this one, brought or pending with respect to the intra-union affairs of District Council No. 9, and observed that "Like the Hatfields and McCoys, however, it appears that District Council No. 9 prefers to keep on 'feudin' and fussin' and a-fightin'." At least some of the issues raised are as elusive to our grasp as that "half-wild hog" belonging to Randolph McCoy, theft of which promoted so much loss of life in that prolonged and infamous feud.

11. Is it poetic justice that these problems which so rile the painters of New York City may call upon the administrative expertise of the Honorable Peter J. Brennan, Secretary of Labor? Secretary Brennan began his career working at the painters' craft, and first held elective office in organized labor in 1947, when he became Business Agent of semi-autonomous Local 1456. Following ten years experience in that office, he served as head of the New York Construction Trades Council, until his Cabinet nomination last year. The Court's experiences with this litigation indicates the distinguished Secretary will need all the experience and expertise his long career implies, and then some, to resolve the problems and conflicts disclosed in this litigation and in *Schonfeld III*.